# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | |
|---|---|
| **TONY DALE KILPATRICK,** } | |
| } | |
| **Plaintiff,** } | |
| } | |
| v.  } | Case No.: 5:08-CV-1649-RDP |
| } | |
| **MICHAEL J. ASTRUE, Commissioner** } | |
| **of Social Security,** } | |
| } | |
| **Defendant.** } | |

## MEMORANDUM OPINION

Plaintiff Tony Dale Kilpatrick brings this action pursuant to Section 205(g) of the Social Security Act ("the Act"), seeking review of the decision of the Commissioner of Social Security ("Commissioner") denying his applications for a period of disability, Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI"). *See* 42 U.S.C. §§ 405(g), 1383(c). For the reasons outlined below, the court finds that the decision of the Commissioner is due to be affirmed because it is supported by substantial evidence and the proper legal standards were applied.

**I.     Procedural History**

Plaintiff was born June 9, 1967 and has a high school education. (Tr. 48, 339). Plaintiff was self-employed as the owner of TNT Siding Company, a vinyl siding business, from April 1991 through May 2002. (Tr. 88). Plaintiff worked as a truss builder for a lumber company from February 1986 through March 1991. (*Id.*). Plaintiff alleges he has been unable to engage in substantial gainful activity since January 1, 2001[1] due to complications from diabetes and 13

---

[1]During the hearing, Plaintiff's onset date of disability was amended to October 24, 2001.

surgeries for broken bones. (Tr. 48, 68). Plaintiff met the insured status requirements to remain covered through December 31, 2005. (Tr. 51-52).

Plaintiff filed applications for disability, DIB, and SSI on October 4, 2005. Plaintiff's applications were denied initially and also upon review. (Tr. 30-34). Plaintiff timely filed a request for a hearing before an administrative law judge ("ALJ"). A hearing was scheduled and held on July 3, 2007 before ALJ Patrick Digby. (Tr. 42, 335-72).

In his July 20, 2007 decision, the ALJ determined that Plaintiff suffers from severe impairments of type II diabetes mellitus, obesity, diabetic peripheral neuropathy, and status post removal of finger. (Tr. 21). However, the ALJ further determined that these impairments, or combination of impairments, do not meet or medically equal one of the listed impairments in the Act. (Tr. 22). The ALJ concluded that Plaintiff has the residual functional capacity ("RFC") to perform light work with a sit/stand option. (Tr. 22-25). Plaintiff's RFC consists of what he can do despite his impairments.

On October 3, 2007, Plaintiff filed a request for a review of the ALJ's decision. (Tr. 13). Plaintiff's request was denied by the Appeals Council on July 8, 2008, and that denial made the ALJ's decision the final decision of the Commissioner, and therefore, a proper subject for this court's review. (Tr. 5-7). This action for judicial review was filed by and through counsel on December 18, 2008. (*See* Pl's Comp.).

Plaintiff's aliments began with a knee injury at the age of 12 in 1980. (Tr. 113). Plaintiff was admitted to the Cullman Orthopedic Clinic on March 20, 1980, complaining of pain in his left knee after suffering an injury during football practice. (*Id.*). It was determined that Plaintiff suffered from acute hemarthrosis, secondary to subluxation of the left patella. (*Id.*). Fluid was removed from

his knee and Plaintiff was counseled on rehabilitation exercises. (*Id.*). Plaintiff returned twice in the next two weeks. (*Id.*). It was noted that Plaintiff did not comply with his rehabilitation recommendations; he was playing basketball and not wearing his knee splint in the correct manner. (*Id.*). Plaintiff was warned that if he did not allow his injury to heal properly, surgery may be imminent. (*Id.*). On April 24, 1980, Plaintiff returned with further injury to his knee, but was released to regular track activities and told to continue with exercising. (Tr. 112). Plaintiff returned over a year later on September 8, 1981 after slipping on a step and re-injuring his knee. (*Id.*). Plaintiff was released on crutches and instructed not to practice football until further notice. (*Id.*). Plaintiff returned on September 14, 1981 and was noted to have excellent quadriceps. (*Id.*).

In August 1983, at the age of 16, Plaintiff returned to Cullman Orthopedic Clinic complaining again of left knee pain due to a football injury. (Tr. 112). After two subsequent visits, Plaintiff was cleared to return to full active participation. (Tr. 111).

Plaintiff fell off of a ladder and hurt his tail bone in July 1985. Plaintiff went to the Cullman Orthopedic Clinic eleven days later on July 29, 1985. (Tr. 111). It was determined that Plaintiff had a pilonidal cyst, but no fractures or dislocations. (*Id.*).

On August 4, 1986, Plaintiff returned to the Cullman Orthopedic Clinic because he had sustained an injury to his left middle finger after punching someone in the mouth. (Tr. 111, 131-32). Plaintiff's finger was surgically debrided[2] by Dr. James Sornsin. (Tr. 129-32). On August 13, 1986, Plaintiff returned because the finger was infected. (Tr. 111, 128). Plaintiff's wound was opened and copiously debrided, and then cleaned, dressed and placed in a splint. (Tr. 111, 128). Plaintiff returned several times over the next few weeks to have the wound redressed and checked for

---

[2] The process of removing nonliving tissue from a wound.

infection. (Tr. 110-11). Throughout the course of those visits, the doctor noted that Plaintiff had not been wearing his splint and that he may not have been taking proper care to prevent infection or further injury. (Tr. 110). By October 1, 1986, the wound had become much worse, and the patient was sent to Dr. Sornsin to get the infection under control. (Tr. 110, 123-26). X-rays showed that Plaintiff's joint appeared to have been destroyed. (Tr. 110). Two days later, surgical debridement of the inflammatory tissue along with a proximal interphalangeal ("PIP") joint infusion was performed by Dr. Sornsin. (Tr. 110, 123-26). A wire was inserted in the finger on October 7, 1986 in order to transfix the PIP joint. (Tr. 127). On October 10, 1986, Dr. Sornsin performed radical debridement and then fused the joint. (Tr. 122). Dr. Sornsin indicated that infection had flared up because Plaintiff had returned to a contaminated environment. (*Id.*). By October 23, 1986, the wound around the finger had healed, however, eight days later the finger was swollen again. (Tr. 109). Treatment notes indicate that Plaintiff had helped some people move the day before which contributed to the swelling. (*Id.*). In December the doctor believed bone fusion had occurred; however, by January 15, 1987, after reporting being quite active with his hand, the doctor indicated that a fibrous ankylosis[3] had occurred. (*Id.*). The doctor indicated that this result was satisfactory as long as it did not cause pain for Plaintiff. (*Id.*).

On May 1, 1987, Plaintiff returned to the Cullman Orthopedic Clinic complaining of pain in his left knee. (Tr. 108). An x-ray of his knee revealed advanced degenerative changes for his age. (*Id.*). Impressions of Plaintiff's injury revealed a tear of the left medial meniscus and patellar malalignment syndrome. (*Id.*). Plaintiff missed his next appointment, but returned May 19, 1987.

---

[3] Reduced joint mobility due to proliferation of fibrous tissue.

(*Id.*). The doctor noted at this appointment that Plaintiff had not been keeping his appointments, but that surgery would be scheduled tentatively for July 7, 1987. (*Id.*). Subsequent treatment notes reveal two missed appointments and five other illegible entries. (*Id.*).

Plaintiff reported to the emergency room of the Cullman Medical Center on July 13, 1987 after he injured his left knee playing basketball. (Tr. 120). It was recommended that Plaintiff have an orthoscopic examination - a procedure he had forgone on several occasions. (*Id.*). In December 1989, Plaintiff reported to Woodland Community Hospital after shooting himself in the right knee with a nail gun. (Tr. 117). The nail was removed and Plaintiff was returned to full active employment within seven days. (Tr. 118).

Plaintiff was x-rayed at the Cullman Orthopedic Center on March 7, 1989, after complaining of an injury to his right ankle. (Tr. 116). The X-Ray revealed no fracture or dislocation. (*Id.*). Almost two months later, Plaintiff presented to the Woodland Community Hospital with an injury to the same ankle. (Tr. 115). It was determined that Plaintiff had swelling consistent with a sprain, but no fracture or dislocation. (*Id.*).

In July 1990, Plaintiff was taken to the University of Alabama at Birmingham emergency room after being involved in an automobile accident. (Tr. 135-42). Plaintiff was riding in the bed of a truck, and sustained lacerations to the head, left ear, and left arm. (*Id.*).

In 1999, Plaintiff was admitted into the Cullman Regional Medical Center emergency room with an unknown shoulder injury. (Tr. 146, 149). Plaintiff's radiology report indicated that there was no fracture or dislocation. (Tr. 151). Plaintiff returned to the emergency room in September 2001 after he injured his left index finger on a chain. (Tr. 152-57). Treatment notes from the incident are mostly illegible, but it seems the incident amputated the tip of the finger. (Tr. 158-59,

162). Surgery was performed on the finger; however, its outcome is difficult to discern. (Tr. 152). Plaintiff returned again to the emergency room in July 2003 when he punctured his arm on a knife. (Tr. 165). The wound was sutured and Plaintiff was prescribed Lortab for pain. (Tr. 168). Later, in November 2003, Plaintiff saw Dr. Beeler with a second shoulder injury. (Tr. 253-54). Plaintiff told Dr. Beeler his rotator cuff had been operated on previously. (*Id.*).

On October 24, 2004 Plaintiff was admitted to the hospital for an abdominal wall cellulitis abscess and also thigh abscesses, which were subsequently found. (Tr. 169-79). Plaintiff had surgery to remove the abscesses. (*Id.*). At that time it was also determined that Plaintiff suffers from diabetes mellitus, morbid obesity, and hypokalemia. Diabetic management was implemented at this time. (Tr. 169, 179). Plaintiff returned to the ER on November 2, 2004, complaining of elevated blood sugar. (Tr. 182-84). He was given six units of Insulin and Lortab. (Tr. 184). It was noted that Plaintiff had blurred vision. (Tr. 183). As a result, Plaintiff was referred to Dr. T.L. Dawson, who performed an eye exam that revealed no diabetic retinopathy. (Tr. 190).

On November 4, 2004, Plaintiff saw Dr. Beeler following his abscess operation. (Tr. 252). Dr. Beeler counseled Plaintiff on the importance of diet and reduced his Glucophage dosage. (*Id.*). On a November 8, 2004 follow-up visit, Dr. Beeler decided to put Plaintiff on Insulin. (*Id.*). Plaintiff missed his appointment scheduled for November 11, 2004, but returned on November 12, 2004 when his blood sugar was recorded at 231. (Tr. 251). Plaintiff saw Dr. Beeler again in December 2004, but he did not return to Dr. Beeler's office again until April 2006. (Tr. 250-51).

In February 2005, Plaintiff went to a local clinic for medication refills. (Tr. 210-11). His blood sugar was 296 and he denied having any pain. (*Id.*). Plaintiff returned on September 30, 2005 with blood sugar so elevated that it would not read on the glucometer. (Tr. 192). Plaintiff reported

that he had been out of insulin for six weeks and was experiencing pain in his feet. (Tr. 192, 208-09). Treatment notes indicate Plaintiff had failed to attend a follow up appointment because, at the time, he wasn't feeling ill. (Tr. 208-09). Plaintiff was subsequently admitted to the hospital. (*Id.*). Hospital records indicate Plaintiff had been noncompliant with treatment; however, his condition quickly improved with medication. (*Id.*). Upon discharge, Plaintiff was diagnosed with uncontrolled type II diabetes, diabetic neuropathy, history of intravenous drug abuse, tobacco dependence, and noncompliance with medications and recommendations. (Tr. 191). On December 20, 2005, Plaintiff returned to the Cullman Regional Center with an infection on his stomach. (Tr. 199-201). Plaintiff had an abscess which was incised and drained; ultimately surgical debridement was performed. (*Id.*). Treatment notes by Dr. Joseph Jowers state that Plaintiff had not followed up with appointments or labs, and that he had not been taking his insulin correctly. (Tr. 199). Dr. Jowers saw Plaintiff again on December 28, 2005, for a follow-up visit. (Tr. 206-07). Plaintiff's blood sugar was noted to be between 300 and 400. (Tr. 206).

On January 26, 2006, Dr. Amit V. Vora performed a consultative physical exam on Plaintiff. (Tr. 232-40). Plaintiff reported pain and numbness in his legs. (*Id.*). He also stated that he could not afford medication, although he continued to smoke a half pack of cigarettes per day. (*Id.*). Dr. Vora's notes state that Plaintiff weighed 312 pounds. (*Id.*). Dr. Vora observed no evidence of pedal edema, calf tenderness, or anemia. (*Id.*). Additionally, pedal pulses were well felt and motor and sensory system examination did not reveal any sensory loss, but reflexes were absent in the lower extremities. (*Id.*).

Plaintiff returned to Dr. Beeler on April 25, 2006. (Tr. 250). Plaintiff stated to Dr. Beeler that he had been noncompliant with his medication due to financial trouble. (*Id.*). Dr. Beeler

assisted Plaintiff with paperwork from a drug company that would help him receive medication at a discount or at no charge at all. (*Id.*). Dr. Beeler noted at this visit that he was not very optimistic about Plaintiff. (*Id.*). Plaintiff returned to see Dr. Beeler on May 2, 2006 for a follow-up on his sugar. (*Id.*). Dr. Beeler noted that Plaintiff had lost 12 pounds, "some how." (*Id.*). Plaintiff's last significant appointment with Dr. Beeler was on June 6, 2006. (Tr. 249). Plaintiff reported trouble with his feet to Dr. Beeler, but said that Lyrica had helped. (*Id.*). Dr. Beeler gave Plaintiff a refill of Lyrica and noted that his obesity had not significantly changed. (*Id.*).

On April 15, 2007, Plaintiff was admitted to the hospital for an infection to his finger after getting a splinter. (Tr. 259-74). Plaintiff underwent irrigation and debridgement and incision and drainage of the left middle finger and was released. (Tr. 259, 263). Plaintiff's discharge record noted that his sugars were under poor control initially, but a consulting physician, Dr. William Peinhardt, was able to bring Plaintiff's sugar down from the 300's to the 80's with some major modifications. (Tr. 259, 261-62). Plaintiff returned to the emergency room seven days later, on April 22, 2007, with recurrent infection and gangrene. (Tr. 280-84). Dr. Ben Gomez performed an amputation of Plaintiff's finger. (Tr. 281-82). It was noted during a May 24, 2007 follow-up visit that Plaintiff was healing well. (Tr. 296). In June 2007, Plaintiff returned to the emergency room with problems related to more abscesses, this time on his arm. (Tr. 311-17).

At the July 3, 2007 hearing, the Vocational Expert ("VE") determined that Plaintiff's past relevant work as a siding installation supervisor was classified as heavy and skilled. (Tr. 362-63). Plaintiff's past work as a truss builder was determined to be medium and very low semi-skilled. (Tr. 363). The ALJ then presented the VE with three hypotheticals. First the ALJ proposed an individual with Plaintiff's age, education, work experience, and training, along with the ability to stand or sit

for six hours a day with regular breaks; occasionally (up to one-third of the day) climb ramps and stairs, balance, kneel, crouch and crawl; frequently (meaning up to two-thirds of the day) stoop; never work around ladders ropes or scaffolds; limited ability to reach overhead; avoid concentrated exposure to extreme cold or heat, fumes, odors, dusts, gases, poor ventilation; avoid all hazardous machinery and unprotected heights; and is able to perform light work. (Tr. 364-65). The VE opined that the hypothetical individual would be precluded from returning to Plaintiff's past work. (Tr. 365). However, the VE opined that the individual could find work as an assembler, labeler, or inspector. (*Id.*). In the second hypothetical, the ALJ proposed the same limitations as above, but for an individual who could perform medium work. (Tr. 366). The VE stated that due to the exertional limitation, the individual would not be able to find work in the medium range. (*Id.*). In the third hypothetical, the ALJ proposed the same limitations as were stated in the first hypothetical for an individual who could perform light work, but included a sit/stand option. (*Id.*). The VE opined that the individual could still find work as an assembler, labeler, or inspector. (Tr. 367).

**II.      ALJ Decision**

Determination of disability under the Act requires a five-step analysis. *See* 20 C.F.R. § 404.1 *et. seq.* First, the Commissioner determines whether the claimant is working. Second, the Commissioner determines whether the claimant has an impairment which prevents the performance of basic work activities. Third, the Commissioner determines whether claimant's impairment meets or equals an impairment listed in Appendix 1 of Part 404 of the Regulations. Fourth, the Commissioner determines whether the claimant's RFC can meet the physical and mental demands of past work. Finally, the Commissioner determines whether the claimant's age, education, and past work experience prevent the performance of any other work. In making a final determination, the

Commissioner will use the Medical-Vocational Guidelines in Appendix 2 of Part 404 of the Regulations when all of the claimant's vocational factors and RFC are the same as the criteria listed in the Appendix. If the Commissioner finds that the claimant is disabled or not disabled at any step in this procedure, the Commissioner will provide no further review of the claim.

The court recognizes that "the ultimate burden of proving disability is on the claimant" and that the "claimant must establish a *prima facie* case by demonstrating that he can no longer perform his former employment." *Freeman v. Schweiker*, 681 F.2d 727, 729 (11th Cir. 1982) (other citations omitted). Once a claimant shows that he can no longer perform his past employment, "the burden then shifts to the [Commissioner] to establish that the claimant can perform other substantial gainful employment." *Id.*

The ALJ found that Plaintiff has not engaged in substantial gainful activity since October 24, 2004, the amended alleged onset date of disability. (Tr. 21). Although the ALJ determined that Plaintiff has severe impairments–type II diabetes mellitus, obesity, diabetic peripheral neuropathy, and status post removal of finger–he determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments of the Act. (Tr. 22). The ALJ determined that Plaintiff retains the RFC to perform the exertional demands of light work with a sit/stand option as described in the Act. (Tr. 24).

The VE called to testify at Plaintiff's hearing, who was familiar with Plaintiff's background, testified that his past relevant work as a supervisor in siding installation is described by the Department of Labor as heavy and skilled. (Tr. 363). Plaintiff's past work as a truss builder is described as a medium job and very low semi-skilled. (*Id.*). When asked to consider Plaintiff's age, education, work experience, training, and assigned RFC, the VE opined that Plaintiff could find work

as an assembler, labeler or inspector. (Tr. 364-66). When asked to consider the same hypothetical, but to factor in a sit/stand option, the VE responded that the individual would be able to perform the same jobs. Based on the VE's testimony and her assessment of Plaintiff's RFC, in addition to the facts in the medical records, the ALJ found that Plaintiff is capable of performing light work with a sit/stand option. (Tr. 22).

**III.   Plaintiff's Argument for Remand or Reversal**

Plaintiff seeks to have the ALJ's decision, which became the final decision of the Commissioner following the expiration of the period to file objections, reversed with benefits awarded, or in the alternative, Plaintiff requests a fourth sentence remand with a hearing before a different law judge. (Doc. 6 at 11). Plaintiff asserts that the ALJ's RFC evaluation of him does not accurately reflect his treatment and limitations as documented through the medical evidence of record.

**IV.   Standard of Review**

The only issues before this court are whether the record reveals substantial evidence to sustain the ALJ's decision, *see* 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), and whether the correct legal standards were applied. *See Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). Title 42, United States Code, Sections 405(g) and 1383(c) mandate that the Commissioner's findings are conclusive if supported by "substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). The district court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the final decision as a whole and determine if the decision is reasonable and supported by substantial evidence. *See id.* (*citing Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Martin*, 894 F.2d at 1529 (*quoting Bloodsworth*, 703 F.2d at 1239) (other citations omitted). If supported by substantial evidence, the Commissioner's factual findings must be affirmed even if the evidence preponderates against the Commissioner's findings. *See Martin*, 894 F.2d at 1529. While the court acknowledges that judicial review of the ALJ's findings is limited in scope, the court also notes that review "does not yield automatic affirmance." *Lamb*, 847 F.2d at 701.

**V.     Discussion**

In light of the legal standards that apply in this case, the court rejects Plaintiff's arguments for remand and/or reversal. For the reasons outlined below, the court finds that the ALJ relied on substantial evidence and the proper legal standards were applied.

    **A.     The ALJ Did Not Err in RFC Findings.**

Plaintiff argues that the ALJ placed too much emphasis on Plaintiff's noncompliance with treatment and continued smoking. Plaintiff contends that the ALJ ignored the fact that although he had been negligent with his treatment in the past, recently Plaintiff had been complying with his treatment orders. Plaintiff has a near twenty-seven year history of noncompliance with treatment. As a youth Plaintiff continued to play basketball and football on an injured knee. (Tr. 113). After his first finger injury, Plaintiff's infection worsened because he had returned to a contaminated environment. (Tr. 122). After getting the infection under control, the finger again worsened after Plaintiff helped someone move. (Tr. 109). At the end of treatment for the finger it was noted that Plaintiff's joint had not fused because he had been too active with the injured finger. (*Id.*). As noted in the ALJ's decision, after being diagnosed with type II diabetes mellitus, Plaintiff had several visits

with Dr. Beeler in which he noted that Plaintiff was not complying with treatment recommendations. (Tr. 208-09, 250). Additionally, Dr. Beeler's records make noted of several missed appointments by Plaintiff. (Tr. 249-54).

At his July 3, 2007 hearing, Plaintiff admitted that he had been noncompliant with treatment in the past but had recently taken his condition more seriously, specifically he stated that in the last twelve months he began to be more conscientious about his condition. (Tr. 342-43, 355). Plaintiff's medical records do not support his statements. Three months before the hearing, when Plaintiff was admitted to the emergency room prior to having his finger amputated, Dr. Gomez noted that Plaintiff's sugars were under poor control and had to be brought down with major modifications by Dr. Peinhardt. (Tr. 259). Although Plaintiff had a year's supply of insulin, he either was not complying with his treatment or was not following up with his physician which caused his sugar to spike so drastically. The Eleventh Circuit has determined, "[t]he Commissioner may deny benefits for the failure to follow treatment when the claimant, without good reason, fails to follow a prescribed course of treatment that could restore the ability to work." *Lucas v. Sullivan,* 918 F.2d 1567, 1571 (11th Cir. 1990). After reviewing the record, the ALJ found that Plaintiff did not have a good reason for his non-compliance.

Plaintiff has stated in the past that he could not afford his medication. (Tr. 250). The ALJ specifically noted that Plaintiff told Dr. Vora he could not afford medication, but that he continued to smoke cigarettes. (Tr. 22). The ALJ correctly states that these statements are at odds with each other–Plaintiff is financially able to purchase cigarettes, but claims he is unable to purchase his medication. Additionally, after Plaintiff's evaluation with Dr. Vora, it was documented that Plaintiff was able to obtain medication with Dr. Beeler's assistance and through a discount drug program. (Tr.

250, 261). Therefore, although Plaintiff contends that despite his past history of noncompliance he has recently begun to comply with treatment, his most recent medical records do not reflect such compliance, and Plaintiff has not presented a viable excuse for such noncompliance.

Plaintiff further argues that the ALJ ignored Dr. Vora's assessment that Plaintiff has absent reflexes in his lower extremities and mildly restrictive shoulder movement. However, Plaintiff has overlooked the facts in the ALJ's opinion which specifically note Dr. Vora's finding that Plaintiff's reflexes are absent. (Tr. 22). Additionally, Plaintiff ignores the fact that the ALJ specifically proposed such limitations to the VE while presenting a hypothetical during the hearing. In his first hypothetical to the VE the ALJ stated, "the hypothetical individual is limited in his ability to reach overhead to occasionally on the left upper extremity. The left upper extremity is limited to occasional reaching in all directions, including overhead. The hypothetical individual should never work around ladders, ropes or scaffolds." (Tr. 364). In addition, the ALJ added a sit/stand option to his hypothetical individual in order to accommodate Plaintiff's lower extremity difficulties. (Tr. 366). Therefore, although Plaintiff does suffer from the severe impairments which were listed by the ALJ, the ALJ met his fifth step burden of identifying work Plaintiff can perform despite his impairments.

Plaintiff also argues that the ALJ's findings are not based on substantial evidence because there is no RFC assessment by an examining physician on which the ALJ could rely. While Plaintiff concedes an RFC assessment is not a requirement for the ALJ to make RFC findings, Plaintiff asserts that the ALJ should have further developed the record to obtain a more accurate and contemporaneous RFC opinion by the examining physician. The court disagrees. Plaintiff's medical records are very well dictated and very clear as to Plaintiff's various objective aliments. Specifically, Dr. Beeler, Plaintiff's treating physician, was quite clear in articulating his appointments with Plaintiff. (Tr. 249-

54). Plaintiff notes the ALJ stated that the record does not contain any opinions from treating or examining physicians indicating that he was disabled or even had limitations greater than those determined in the decision.

Plaintiff further argues that the ALJ is required to review and accord weight to medical opinion, and as a practical matter to avoid substituting his judgement for that of a physician. Once again, though there is no opinion stating Plaintiff's disability, the record is not lacking in clear opinions and treatments notes from Plaintiff's physicians about the severity and extent of his impairments. The record contains substantial evidence for the ALJ to have reached his conclusion.

Plaintiff's final argument is that the ALJ incorrectly categorized Plaintiff's obesity as being yet another form of non-compliance. Plaintiff contends that the ALJ misstated the record when he said treatment notes from April 2006 indicate Plaintiff lost 12 pounds and "was better." (Tr. 24). Although the ALJ did misquote the treatment notes of Dr. Beeler, that is harmless error. The ALJ acknowledged that Plaintiff suffers from obesity and that this condition contributes to his other impairments. However, the Eleventh Circuit has found that the severity of a medically ascertained impairment must be measured in terms of its effect upon a claimant's ability to work and not simply in terms of deviation from medical standards of bodily normality. *McCruter v. Bowen,* 791 F.2d 1544 (11th Cir. 1986). Here, the ALJ found that Plaintiff could perform work despite his impairments and that finding is supported by substantial evidence. As noted previously, the ALJ added a sit/stand option to his hypothetical to the VE in order to accommodate Plaintiff's impairments. Additionally, the ALJ stated in his hypothetical that the individual should never work around ladders, ropes or scaffolds, further accommodating Plaintiff's obesity. As a result, the VE stated that Plaintiff could

find work as an assembler, labeler, and inspector. Therefore, the ALJ adequately considered Plaintiff's obesity and correctly determined Plaintiff's RFC.

**VI.  Conclusion**

For the reasons stated above, the court concludes that the ALJ's determination that Plaintiff is not disabled is supported by substantial evidence and the proper legal standards were applied in reaching this determination. The Commissioner's final decision is due to be affirmed, and a separate order in accordance with this memorandum opinion will be entered.

**DONE** and **ORDERED** this      24th      day of September, 2009.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE